UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KEITH JACKSON,

                    Plaintiff,

        v.                                    Case No. 17-cv-194-pp

DR. PATRICK MURPHY, GARY HAMBLIN,
EDWARD WALL, JUDY SMITH,
SARA SCHNEIDER, DANIELLE FOSTER,
MORGAN BAILEY, WILLIAM MCCREEDY,
WILLIAM GOLDEN, JAMIE BARKER,
DAVID BURNETT, LON BECHER,
HOLLY GUNDERSON, ASHLEE WALDVOGEL,
THERESA MURPHY, CARRIE SPRANGER,
WELCOME ROSE, LORI ALSUM
and CHARLES FACKTOR,

                    Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
(DKT. NOS. 152, 159) AND DISMISSING CASE**

---

Plaintiff Keith Jackson is a prisoner representing himself. The court screened his complaint and allowed the plaintiff to proceed on an Eighth Amendment deliberate indifference to a serious medical need claim, based on allegations that the defendants delayed and failed to treat his soft tissue disease symptoms over the course of about four and a half years (from February 27, 2012 until August 2016), resulting in unnecessary pain and suffering. See Dkt. No. 40 at 3-5. Defendant Wall has filed a motion for summary judgment, dkt. no. 152, as have the other defendants[1], dkt. no. 159.

---

[1] The court refers to the other defendants as the "State defendants."

1

## I.    Facts

The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

### A.    Defendant Wall's Facts

Defendant Edward Wall was the secretary of the State of Wisconsin Department of Corrections ("DOC") from October 27, 2012, until February 27, 2016. Dkt. No. 154 at ¶1. Although Wall had general supervisory authority over DOC operations, he did not supervise day-to-day operations of individual DOC institutions while he served as secretary. Id. at ¶2. Instead, Wall deferred to corrections staff at each institution to make day-to-day decisions and supervise inmates. Id.

Under Wis. Admin. Code §DOC 310, the Inmate Complaint Review System was established for inmates to process grievances. Id. at ¶3. Under Wis. Admin Code §§DOC 310.03(15) and 310.14, the DOC secretary's designee was responsible for investigating and issuing the final decision as to offender complaint appeals. Id. at ¶4. Because only the DOC secretary's designees were responsible for reviewing and deciding offender complaints that were appealed from the corrections complaint examiner's office, Wall, during his tenure as DOC secretary, would not have been made aware if an inmate filed an offender complaint regarding safety concerns or medical treatment, and he was not personally involved in determining the disposition of inmate complaints or appeals. Id. at ¶5. Likewise, Wall had no personal involvement in the handling,

2

processing, investigating or deciding of the plaintiff's complaints or appeals. Id. at ¶6.

B.    State Defendants' Facts

At the time of the events described in the complaint, the plaintiff was an inmate at Oshkosh Correctional Institution. Dkt. No. 170 at ¶1. Dr. Patrick Murphy was the plaintiff's physician and Ashlee Waldvogel was a nurse there. Id. at ¶2. Judy Smith was the warden. Id. at ¶3. Danielle Foster was the health services manager. Id. Theresa Murphy and Carrie Spranger were institution complaint examiners. Id. at ¶4. Welcome Rose and Charles Factor were corrections complaint examiners. Id. William Golden was the assistant health services manager from April 2012 through November 2013. Id. at ¶5. Jamie Barker was the assistant health services manager from February 2014 through October 2015. Id. William McCreedy was the health services manager at Kettle Moraine Correctional Institution but assisted with inmate complaints at Oshkosh when needed. Id. at ¶6. Since 2011, Lon Becher has been a health services nursing coordinator employed by the DOC's Bureau of Health Services. Id. at ¶7. Since 2007, Holly Gunderson has been a health services nursing coordinator employed by the Bureau of Health Services. Id. Since 2009, Lori Alsum has been a health services nursing coordinator employed by the Bureau of Health Services. Id. Gary Hamblin was the secretary of the DOC from January 2011 through October 2012. Id. at ¶8. David Burnett was the medical director of the Bureau of Health Services from October 2001 through October

2013. Id. at ¶9. Morgan Bailey and Sara Schneider retired in 2011, before the claims at issue in this lawsuit began. Id. at ¶10.

1. *Plaintiff's Testicular Pain*

The plaintiff had been diagnosed with a two- to three-centimeter epididymal cyst in his left testicle prior to arriving at Oshkosh.[2] Id. at ¶11. Epididymal cysts are common in men.[3] Id. The standard of care for treating an epididymal cyst is conservative treatment[4] including over the counter non-steroidal anti-inflammatory drugs (NSAIDs) and a scrotal support. Id. at ¶12. Surgery is considered only if a patient is non-functional due to pain because surgery carries very significant potential risks, including an increase in pain. Id. at ¶13.

Dr. Murphy's first appointment with the plaintiff regarding his testicular pain was on June 18, 2012.[5] Id. at ¶14. The plaintiff had multiple complaints at this appointment. Id. He stated that he had testicular pain that he believed

---

[2] An epididymal cyst is a noncancerous swelling in the duct behind the testes that transports sperm. See https://medlineplus.gov/ency/article/001283.htm (last visited May 31, 2020).

[3] The plaintiff disputes that cysts or lumps are common in men. Dkt. No. 178 at ¶11. He states that during a telemedicine meeting on June 28, 2019, Dr. Emily Serrell with the UW Urology Department told him that it is not common for men to grow lumps or cysts in their testicles. Id. Dr. Serrell told the plaintiff that sometimes Gabapentin is prescribed, but that it was not always helpful with pain. Id.

[4] The plaintiff says that Dr. Serrell told him that treatment for such a cyst is not conservation. Dkt. No. 178 at ¶11.

[5] The plaintiff alleges that he complained about his testicular pain at prior appointments with Dr. Murphy, on April 22, 2011, November 8, 2011 and March 19, 2012. Dkt. No. 178 at ¶14.

4

was caused from the cyst. Id. The plaintiff already was taking medications, such as Gabapentin, to address other complaints of pain. Id. at ¶15. Dr. Murphy decided to increase the dosage of Gabapentin in an effort to reduce the plaintiff's pain. Id. But Dr. Murphy noted that the plaintiff was functioning at a high level because he was able to play handball and softball, and to work in the institution. Id. at ¶16. Dr. Murphy also noted that the plaintiff walked without a limp and without grimacing, meaning he was functional at the appointment. Id. Additionally, the plaintiff already had a special needs restriction in place to allow him one athletic supporter/scrotal support to help with his testicular pain. Id. at ¶17. This was the standard of care for treating the cyst and the plaintiff's complaints of pain because he was functional and, therefore, surgery was not a recommended option. Id. at ¶18.

Dr. Murphy had follow-up appointments with the plaintiff on February 5, 2013 and June 11, 2013. Id. at ¶19. During these appointments, the plaintiff continued to be high functioning because he was playing handball, lifting weights and walking. Id. The plaintiff also reported that the Gabapentin, Tylenol and scrotal support helped with the pain, so Dr. Murphy continued these treatments. Id. Because the plaintiff continued to demand that his cyst be removed, Dr. Murphy also ordered an ultrasound which was performed on June 24, 2013. Id. at ¶20. The ultrasound showed only minor growth. Id.

At a follow-up appointment with the plaintiff on July 16, 2013, Dr. Murphy decided to order an evaluation by a urologist at UW Hospital and Clinics. Id. at ¶21. The plaintiff saw Dr. Streeper at UW-Urology on August 9,

2013. Id. at ¶22. Dr. Streeper noted that the cyst did not show any signs of growth. Id. Dr. Streeper did not recommend removal of the cyst, which angered the plaintiff who became argumentative and demanded that the cyst be removed. Id. Dr. Streeper recommended an evaluation by a pain clinic. Id. Dr. Murphy believed it was appropriate to wait six months to put in a referral for the pain clinic because the plaintiff was highly functional and had reported that the medications and scrotal support were giving him some pain relief. Id. at ¶23. If there was no improvement in six months, or if his condition changed prior to that, Dr. Murphy planned to reevaluate the recommendation to send the plaintiff to the pain clinic. Id.

Dr. Murphy next saw the plaintiff on October 16, 2013. Id. at ¶24. The plaintiff's pain had not improved, so Dr. Murphy recommended that the plaintiff be sent to a pain management clinic. Id.

The plaintiff was seen by the pain management clinic on November 7, 2013. Id. at ¶25. Clinic staff believed that the plaintiff's testicular pain was neuropathic, meaning potentially coming from the nerves in his back, and recommended that the plaintiff have an MRI of the lumbar spine including the lumbar and sacral plexus. Id.

In February 2014, the plaintiff was seen by UW-Urology for a follow-up appointment. Id. at ¶26. Dr. Streeper recommended surgery to remove the cyst but noted that surgery may not resolve his pain and could worsen it. Id.

The plaintiff saw Dr. Murphy again on March 4, 2014. Id. at ¶27. Dr. Murphy did not believe, based on his medical judgment, that surgery was the

6

best option because conservative treatment options had not been exhausted; the plaintiff had only recently begun to see the pain management clinic. Id. Dr. Murphy wanted to attempt all conservative methods and avoid surgery, if possible, because there was no evidence that the surgery would improve the plaintiff's pain, and there was a very serious possibility that the surgery could worsen his pain. Id. Based on Dr. Murphy's professional judgment, he felt it was best to attempt the pain management options before surgery was performed—the pain management previously had been recommended by UW-Urology. Id. at ¶28. Additionally, the pain clinic believed that the plaintiff's pain was neuropathic and recommended he have an MRI on his lumbar spine. Id. at ¶29. This MRI was in the process of being rescheduled due to the plaintiff's cough and nasal congestion. Id. The plaintiff's persistent cough and nasal congestion also caused Dr. Murphy to believe that the plaintiff was not in the best health to undergo an elective operation to remove the cyst, and Dr. Murphy wanted to wait until these symptoms improved before scheduling the surgery. Id. at ¶30.

Dr. Murphy met with the plaintiff again on May 2, 2014. Id. at ¶31. Dr. Murphy made a treatment plan to have the MRI taken, for the plaintiff to be evaluated for a possible steroid injection and to have surgery if the steroid injection was no help. Id. On May 23, 2014, the plaintiff had an MRI completed on his lumbar which showed no gross abnormalities. Id. at ¶32.

Dr. Murphy had another appointment with the plaintiff on October 3, 2014. Id. at ¶33. The plaintiff reported continued pain from his epididymal

cyst. Id. Dr. Murphy recommended that the plaintiff receive an ultrasound to reevaluate the size of the cyst. Id. Dr. Murphy still did not feel surgery was the best treatment route for the plaintiff because:

- The plaintiff remained highly functional and was able to play softball;
- The plaintiff was getting some relief from the conservative pain management—he reported that the low bunk restriction Dr. Murphy ordered, the Tylenol and the scrotal support helped with his pain;
- Dr. Murphy also noted that while UW had made a recommendation for surgery, the plaintiff had been argumentative with them and demanded the surgery, so Dr. Murphy believed the plaintiff may have influenced their decision;
- The plaintiff refused to try a medication used for chronic pain, Imipramine, which in Dr. Murphy's mind meant that all conservative options had not yet been exhausted; and
- Dr. Murphy feared that the surgery could cause the plaintiff more pain.

Id. Dr. Murphy believed, based on his medical judgment, that it was best to continue to work on pain management options to address the plaintiff's complaints first. Id. at ¶34.

An ultrasound taken on October 13, 2014 showed that the plaintiff's cyst had not grown and remained at approximately four centimeters in diameter. Id. at ¶35. The plaintiff continued to receive his pain management medication and athletic supporters. Id.

The plaintiff had another appointment with Dr. Murphy on February 11, 2015. Id. at ¶38. He was adamant that he wanted his epididymal cyst removed. Id. Because Dr. Murphy had attempted multiple conservative interventions to avoid surgery and the plaintiff wanted to have the surgery, knowing the risks, Dr. Murphy felt it was appropriate to recommend the plaintiff to UW-Urology for surgery. Id.

8

The plaintiff was seen by UW-Urology on April 24, 2015 for the epididymal cyst. Id. at ¶36. The risks and benefits of the surgery were explained to the plaintiff and a follow-up was recommended in around three months. Id. On July 31, 2015, the plaintiff was seen by UW-Urology where it was explained to him that his epididymal cyst was small and likely inoperable and that an operation may cause him additional pain.[6] Id. at ¶37.

On November 6, 2015, following the February 11, 2015 referral from Dr. Murphy and continued treatment and evaluation for his pain, the plaintiff underwent surgery to remove the epididymal cyst. Id. at ¶39.

After the surgery, the plaintiff had some post-operative swelling but was found to be healing appropriately. Id. at ¶40. The plaintiff continues to be seen by UW-Urology regularly for treatment related to his testicular symptoms. Id. at ¶41.

### 2. *Plaintiff's Nasal Symptoms*

On June 11, 2013, the plaintiff began to report that he was having nasal congestion and difficulty breathing and that he had a cough for about two weeks. Id. at ¶42. Dr. Murphy ordered cough medicine for the plaintiff and told him to follow up if his symptoms did not improve in two weeks. Id. at ¶43. The plaintiff's congestion and coughing continued into July 2013, when Dr. Murphy saw him multiple times at the Health Services Unit. Id. at ¶44. Dr.

---

[6] The plaintiff believes that UW-Urology was sent the wrong ultrasound report and that, after reading the report, Dr. Blute at UW-Urology lied and claimed he could not feel the lumps attached to the plaintiff's testicles, although they were—according to the plaintiff—as big as bird eggs. Dkt. No. 178 at ¶37.

9

Murphy believed that the plaintiff may have had an upper respiratory infection that was causing his persistent symptoms. Id. Dr. Murphy prescribed him antibiotics, a Neti Pot and albuterol to treat his symptoms and possibly the infection. Id. at ¶45. Additionally, a chest x-ray was performed which ruled out pneumonia. Id. This is the standard of care for treating upper respiratory infections. Id. at ¶46.

On October 16, 2013, Dr. Murphy saw the plaintiff again for a follow-up regarding his congestion. Id. at ¶47. The plaintiff reported that he remained congested but that his cough had resolved since the last time Dr. Murphy had seen him. Id. Since the plaintiff no longer had a cough, Dr. Murphy thought the upper respiratory infection had resolved. Id. To address the plaintiff's continued congestion symptoms, Dr. Murphy prescribed an allergy medication, Cetirizine, to treat the possible underlying allergies and reduce inflammation and congestion. Id. at ¶48. The plaintiff already had been using a nasal spray for several years which would also help his symptoms. Id. This is the standard of care for treating congestion. Id. at ¶49.

In December 2013, the plaintiff was unable to complete an MRI scan due to his congestion and cough. Id. at ¶50. However, when Dr. Murphy saw him for a follow-up that following May, the plaintiff's congestion symptoms had improved. Id.

From October 2013 to May 2014, the plaintiff was prescribed several medications to address his congestion symptoms such as a nasal steroid inhaler, an antihistamine (Cetirizine), a Neti Pot to flush out his sinuses and

Guaifenesin to thin the nasal secretions. Id. at ¶51. By October 2014, the plaintiff reported that the congestion was still occurring even when using the nasal spray and Neti Pot. Id. at ¶52. Dr. Murphy felt that the plaintiff was suffering from allergic rhinitis (hay fever) and that the best course of treatment for him would be to continue the prescribed treatments as his conditions did not seem to warrant surgery. Id. Dr. Murphy wanted to continue attempting to resolve the issue utilizing conservative treatment options before sending him to an ear, nose and throat specialist, because specialists prefer to see that multiple courses of treatment are attempted and failed prior to seeing the patient for extreme interventions. Id. at ¶53.

On February 11, 2015, the plaintiff continued to complain of nasal congestion and difficulties breathing despite using the sinus cleanses. Id. at ¶54. At this point Dr. Murphy had attempted multiple conservative treatment options with no resolution of his symptoms, so he referred the plaintiff to an ear, nose and throat specialist for evaluation. Id.

The plaintiff was seen by an ear, nose and throat specialist on March 2, 2015 for the nasal congestion. Id. at ¶55. The diagnosis was that the plaintiff's congestion was caused by a deviated septum and enlarged turbinates, which can be caused by allergies.[7] Id. A deviated septum is a very common condition

_____

[7] Turbinates "are small structures inside the nose that cleanse and humidify air that passes through the nostrils into the lungs." Turbinates "can become swollen and inflamed by allergies, irritation or infection, causing nasal obstruction and producing an excessive amount of mucous which leads to congestion." Id.https://stanfordhealthcare.org/medical-treatments/n/nasal-surgery/types/turbinate-reduction.html.

where the nasal septum is off center, making one nasal passage off-center. Id. It was recommended that the plaintiff increase the use of the spray to twice daily for a month. Id. at ¶56. If this intervention did not work, it was recommended that the plaintiff consider a septoplasty and turbinate reduction to fix the problem. Id. The reason it was appropriate to try the nasal sprays first, before surgery, is because sometimes difficulty breathing or congestion is caused by swelling in the tissue in the lining of the nose. Id. at ¶57. It was medically appropriate to determine whether the plaintiff's congestion could be resolved by using nasal sprays prior to surgery. Id.

A month later, on April 2, 2015, the plaintiff went to ear, nose and throat specialists for a follow-up due to his continued complaints of congestion. Id. at ¶58. They recommended that surgery be considered for the plaintiff's deviated septum and enlarged turbinates and that he should continue to use the nasal spray previously prescribed. Id. Additionally, they noted he could have allergies which were causing his symptoms. Id.

Dr. Murphy directed the Health Services Unit to schedule the surgery as recommended. Id. at ¶59. On May 6, 2015, the plaintiff underwent septoplasty surgery to address his nasal congestion and deviated septum. Id. at ¶60. The plaintiff received hydrocodone for the pain after the surgery, followed by Tylenol. Id. He was also directed to continue the nasal spray he had been prescribed prior to the surgery and the sinus cleansing kit. Id. Additionally, the plaintiff was scheduled to have a follow-up appointment with the ear, nose and throat specialists in a week. Id.

The plaintiff saw the ear, nose and throat specialists for follow-up appointments on May 13, 2015 and May 17, 2015. Id. at ¶61. The plaintiff continues to be seen regularly by the ear, nose and throat specialist for medical care. Id. at ¶62.

### 3. *Plaintiff's Abdominal Pain*

The plaintiff repeatedly, but intermittently, complained of chronic stomach pain, diarrhea and gas during his appointments with Dr. Murphy between February 2012 and October 2016. Id. at ¶63. It appeared to Dr. Murphy that the plaintiff was suffering from irritable bowel syndrome. Id. The standard of care for treating irritable bowel syndrome is to prescribe fiber, antispasmodics, stool softeners, and, if needed, pain medications such as Tylenol, Gabapentin or antidepressants. Id. at ¶64. Coping skills are also helpful in dealing with chronic pain that is sometimes associated with irritable bowel syndrome. Id. Abdominal pain and irritable bowel syndrome are difficult to treat. Id. at ¶65. Irritable bowel syndrome does not have a cure; usually physicians treat it by prescribing medications that calm the symptoms. Id.

Dr. Murphy tried multiple medications that were known to be effective for stomach pain and irritable bowel syndrome, such as docusate sodium, dicyclomine, calcium carbonate and Gabapentin. Id. at ¶66. The plaintiff reported that none of these medications worked for his abdominal pain, so Dr. Murphy suggested several other medications to resolve the abdominal pain. Id. Dr. Murphy recommended that the plaintiff try to take a medication known as Imipramine, but the plaintiff refused to take the Imipramine, which led Dr.

13

Murphy to believe that his symptoms might not be as severe as the plaintiff claimed they were.[8] Id. at ¶67.

Dr. Murphy also requested that the plaintiff be given a prescription for a non-formulary medication commonly known as Beano to reduce his gas and thereby hopefully reduce his abdominal pain. Id. at ¶68. The Bureau of Health Services medical director denied this request, and Dr. Murphy could not override the decision. Id. Regardless, the plaintiff had access to Beano by ordering it through canteen. Id. Additionally, the plaintiff already was receiving pain medication, such as Tylenol, to address pain he reported in other areas of the body. Id. at ¶69. Tylenol would be able to assist him with stomach pain as well. Id.

The plaintiff had multiple abdominal CT scans completed over the years to assure that a desmoid tumor (that had previously been removed) had not returned. Id. at ¶70. He received scans in 2009, 2010, 2011, 2013 and 2017. Id. Not only did these CT scans show no evidence of a recurrent tumor, they showed no other causes for his reported abdominal pain, which confirmed to Dr. Murphy that conservative treatment through medications was the appropriate treatment. Id.

---

[8] The plaintiff states that the Imipramine was "another experimentation" by Dr. Murphy and that it is a drug for "physiological use" that Dr. Murphy claimed would help his stomach pain. Dkt. No. 178 at ¶67. The plaintiff says that he looked the drug up in the prison library, then told Dr. Murphy he did not want any drug that altered his mind, but that Dr. Murphy ordered it anyway against the plaintiff's wishes. Id.

14

### 4. *Plaintiff's Claim against Nurse Waldvogel*

Nurse Waldvogel met with the plaintiff in the Health Services Unit on April 29, 2014 to discuss the plaintiff's request for a new scrotal support. Id. at ¶71. Prior to the appointment, Waldvogel had reviewed the plaintiff's medical chart and noted that he had been given a new scrotal support on April 16, 2014—thirteen days before the appointment. Id. At the appointment with Waldvogel, the plaintiff brought one of his scrotal supports that was falling apart, and demanded that it be replaced. Id. at ¶72. But the plaintiff admitted that the scrotal support that was falling apart was an old one, and that he had been given a new one on April 16. Id. The plaintiff asked that he be given a new one, but inmates are only allowed to have one scrotal support unless an additional one is ordered by a physician. Id. at ¶73.

Nurse Waldvogel did not have the authority to allow the plaintiff to have two scrotal supports.[9] Id. at ¶74. Nevertheless, she flagged his medical chart for Dr. Murphy to review so that Dr. Murphy could determine whether the plaintiff could have two scrotal supports. Id. at ¶75. Dr. Murphy placed an order for the plaintiff to be allowed to have a second scrotal support on May 2, 2014, and on that same day he was given an additional scrotal support. Id. at ¶76.

---

[9] The plaintiff clarifies that he asked for a new scrotal support because the one he had been given was broken. Dkt. No. 178 at ¶74. He says he was not asking to have two supports, but was asking Waldvogel to replace the newer one, which had broken. Id.

15

5. *Plaintiff's Failure to Intervene Claim*

On February 12, 2013, Golden, an assistant health services manager, responded to a letter he received from the plaintiff in which the plaintiff complained that he should not be required to purchase a dietary supplement, known as Beano, from the canteen (prison store) because he could not afford the tablets and they were prescribed to him. Id. at ¶77. The plaintiff did not otherwise complain of his medical treatment—he did not indicate he was being denied treatment for testicular, stomach or nose pain. Id. Golden reviewed the plaintiff's medical record which showed that Dr. Murphy had submitted a non-formulary drug request to Correction's Central Pharmacy Services to include Beano as a prescription for the plaintiff. Id. at ¶78. The Bureau of Health Services medical director denied this request. Id. Golden did not have the authority to override this decision and flagged the plaintiff's chart for Dr. Murphy's review. Id.

Golden received correspondence from the plaintiff on March 13, 2013 and March 27, 2013. Id. at ¶79. Golden responded to each by explaining the policies and discussing the plaintiff's recent treatment. Id. Golden reviewed the plaintiff's medical record and flagged his record for review when necessary. Id.

On October 30, 2013, Golden sent two letters in response to multiple correspondences he'd received from the plaintiff in which the plaintiff complained of his medical care, copayments and several other items.[10] Id. at

---

[10] The proposed findings of fact indicate that Golden sent the plaintiff "to" letters; the referenced exhibits make it clear that this is a typo, and that Golden sent "two" letters to the plaintiff.

¶80. Golden referred the plaintiff to, and explained, the policies that were relevant to his concerns and reviewed his medical record. Id. The plaintiff was being seen frequently by multiple medical professionals, so Golden believed that the plaintiff's medical needs were being appropriately addressed. Id.

Warden Smith received and responded to multiple correspondences from the plaintiff from January to February of 2014, in which the plaintiff complained about his medical care and how his inmate complaints were handled. Id. at ¶81. Smith investigated each claim, explained she was not the appropriate person to contact and directed the plaintiff to contact the proper staff. Id.

On December 12, 2014, Barker, an assistant health services manager, responded to multiple correspondences the Health Services Unit received from the plaintiff and arranged a meeting with the plaintiff at the Health Services Unit on December 18, 2014 to discuss the plaintiff's complaints. Id. at ¶82. The plaintiff saw Barker on December 18, 2014 and they discussed several complaints the plaintiff had relating to his medical care. Id. at ¶83. Barker explained Health Services Unit policies, discussed the plaintiff's current treatment plan and advised him to continue to contact the Health Services Unit with any concerns. Id. This was the only face-to-face contact Barker had with the plaintiff. Id.

Health services managers and assistant health services managers are frequently contacted by the institution complaint examiner to investigate inmate complaints relating to medical care. Id. at ¶84. Managers then review

17

medical records and provide a timeline of relevant treatment. Id. Health services managers and assistant health services managers do not make decisions on inmate complaints. Id. Frequently, the plaintiff would send health service requests, sometimes several per week and even per day, to the Health Services Unit complaining of pain and other health issues. Id. at ¶85. Each request was responded to and the plaintiff was regularly scheduled to be seen for medical assessment; however, the plaintiff would then refuse assessments by registered nurses for his complaints—the plaintiff refused over fifty appointments with Health Services staff between February 2012 and October 2016. Id.

The plaintiff filed multiple inmate complaints complaining about the care that he was receiving. Id. at ¶86. These inmate complaints were investigated by reviewing the plaintiff's medical records and talking to Health Services Unit staff. Id. The investigations showed that the plaintiff was being seen regularly by Dr. Murphy, and that Dr. Murphy had created an appropriate treatment plan for the plaintiff's multiple complaints including off-site appointments with specialists from the University of Wisconsin Hospital and Clinics. Id. at ¶87. The plaintiff's records also documented that he regularly refused appointments with the Health Services Unit staff. Id.

The plaintiff's claim against Alsum, Barker, Becher, Burnett, Facktor, Foster, Golden, Hamblin, McCreedy, T. Murphy, Rose, Smith and Spranger is limited to their roles in allegedly receiving and responding to correspondence and inmate complaints that the plaintiff filed, complaining about his medical

18

care. Id. at ¶88. He claims that they failed to intervene to assure that he received medical care from Dr. Murphy. Id.

## II. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be

19

admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.     Discussion[11]

1.     *Medical Care Standard*

"The Eighth Amendment's proscription against 'unnecessary and wanton infliction of pain' is violated when prison officials demonstrate 'deliberate indifference to serious medical needs' of prisoners—whether the indifference 'is manifested by prison doctors in response to prison needs or by prison guards in intentionally denying or delaying access to medical care.'" Lewis v. McLean, 864 F.3d 556, 562 (7th Cir. 2017) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). A deliberate indifference claim contains both an objective and a subjective component. "[A] prisoner must first establish that his medical condition is 'objectively, sufficiently serious,' and second, that prison officials acted with a 'sufficiently culpable state of mind'—i.e., that they both knew of

---

[11] The plaintiff filed a 75-page response to the defendants' proposed findings of fact, in which he incorporates legal arguments into his responses to the defendants' proposed facts, along with over 300 pages of exhibits. Dkt. Nos. 178, 178-1. The defendants subsequently filed their reply briefs. Dkt. Nos. 180, 181. The plaintiff then filed letters regarding his response to the defendants' motions for summary judgment in which he says that he inadvertently failed to submit his "legal argument;" the letters include legal arguments in response to the defendants' summary judgment motions. Dkt. Nos. 185, 186. The court received the plaintiff's second legal argument. Dkt. No. 187. The plaintiff's first and second legal arguments—dkt. nos. 185 and 187—are nearly identical and contain the same arguments. Because the plaintiff doesn't have a lawyer, the court has considered the plaintiff's arguments, even though he filed them outside of the briefing deadlines.

and disregarded an excessive risk to inmate health." Id. at 562-63 (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).

## 2. *State Defendants' Motion for Summary Judgment*

### a. Defendants Bailey, Schneider and Gunderson

The State defendants contend that Bailey, Schneider and Gunderson are entitled to summary judgment because they had no personal involvement in the alleged constitutional deprivation. Dkt. No. 160 at 13-14. Defendants Bailey and Schneider retired in 2011, before the incidents described in the complaint. See Dkt. No. 1 at 12 ("My claim is starting with a date of 2-27-12."). The record does not include any evidence that Gunderson was involved in the plaintiff's allegations. The court will grant the State defendants' motion for summary judgment as to Bailey, Schneider and Gunderson based on their lack of personal involvement in the plaintiff's allegations. See Burks v. Raemisch, 555 F.3d 592, 593-94 (7th Cir. 2009).

### b. Defendant Waldvogel

The State defendants contend that Nurse Waldvogel was not deliberately indifferent to the plaintiff's medical needs. Dkt. No. 160 at 17. They state that the plaintiff's claim against Waldvogel is limited to her interaction with him on April 29, 2014 when he asked for a new scrotal support. Id. According to the defendants, Waldvogel did not have the authority to allow the plaintiff to have two scrotal supports, but she flagged his medical chart for review so that Dr. Murphy could determine whether he could have two. Dr. Murphy subsequently placed an order for the plaintiff to be allowed to have a second scrotal support

21

on May 2, 2014, and the plaintiff was given an additional scrotal support the same day. The defendants contend that this evidence shows Nurse Waldvogel appropriately notified Dr. Murphy that the plaintiff was requesting a second scrotal support, and within three days he was given a second one, and that this is not deliberate indifference. Id. at 17-18.

The plaintiff does not dispute these facts; he clarifies only that he didn't go to Waldvogel seeking permission for two supports, but was seeking to have a defective support replaced. Whether the plaintiff was asking for a second support or asking to have a defective support replaced, Nurse Waldvogel appears to have understood him to be asking for a second support. She denied that request per the policy, but flagged the issue for Dr. Murphy, who obtained a second scrotal support for the plaintiff. Nothing about this set of facts shows that Waldvogel was deliberately indifferent to the plaintiff's medical need. By flagging the issue for Dr. Murphy's review, she made sure that a doctor made the decision about whether the plaintiff could receive what he requested, and that doctor granted the plaintiff's request. The court will grant the State defendants' motion for summary judgment as to Nurse Waldvogel.

c.     Defendant Dr. Murphy

The State defendants contend that Dr. Murphy was not deliberately indifferent to the plaintiff's medical needs. Dkt. No. 160 at 18. The defendants argue that the plaintiff's claims regarding his testicular pain, stomach pain and nose complaints fail because Dr. Murphy provided the plaintiff with extensive and appropriate medical care. Id. at 18-23. The plaintiff responds that Dr.

22

Murphy persisted in an ineffective course of treatment which left him in pain for years. Dkt. No. 185 at 4. The plaintiff asserts that a reasonable jury could conclude that Dr. Murphy acted with deliberate indifference by waiting so long to refer him for surgery and to the pain clinic. Id.

The defendants do not argue that the plaintiff did not have a serious medical need, so the court will focus on the deliberate indifference prong of the Eighth Amendment claim. In Zaya v. Sood, 836 F.3d 800 (7th Cir. 2016), the Court of Appeals for the Seventh Circuit set the standard for, and explained the considerations regarding, deliberate indifference claims where a medical professional provides an inmate with allegedly unconstitutional medical treatment.

> Deliberate indifference requires that a defendant "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The standard is a subjective one: The defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference. *Id.* The requirement of subjective awareness stems from the Eighth Amendment's prohibition of cruel and unusual *punishment*; "an *inadvertent* failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. at 105, 97 S.Ct. 285 (emphasis added). Whether a prison official was subjectively aware of a risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970 (citation omitted).
>
> Any inquiry into a defendant's mental state is fraught with difficulties, but those difficulties are often amplified when the defendant is a medical professional. We have consistently held that neither difference of opinion among medical professionals nor even admitted medical malpractice is enough to establish deliberate

indifference. *See, e.g., Petties v. Carter*, No. 14–2674, —— F.3d ——, ——, 2016 WL 4631679, slip op. at 8 (7th Cir. Aug. 25, 2016) (en banc); *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). However, we have also made clear that an inmate need not show that he was "literally ignored" to prevail on a deliberate-indifference claim. *Conley v. Birch*, 796 F.3d 742, 748 (7th Cir. 2015) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). A doctor who provides some treatment may still be held liable *if he possessed a sufficiently culpable mental state. See Petties*, —— F.3d at ——, 2016 WL 4631679, slip op. at 12.

It is in this context that we have emphasized the deference owed to the professional judgment of medical personnel. *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013); *see also Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) (describing the "'professional judgment' standard"). By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

But deference does *not* mean that a defendant automatically escapes liability any time he invokes professional judgment as the basis for a treatment decision. When the plaintiff provides evidence from which a reasonable jury could conclude that the defendant didn't *honestly* believe his proffered medical explanation, summary judgment is unwarranted. *See Petties*, —— F.3d at ——, 2016 WL 4631679, slip op. at 12. ("When a doctor says he did not realize his treatment decisions (or lack thereof) could cause serious harm to a plaintiff, a jury is entitled to weigh that explanation against certain clues that the doctor *did* know."). That evidence may consist of "clues" drawn from the context surrounding a treatment decision. *Id.* And if the defendant's chosen "course of treatment" departs radically from "accepted professional practice," a jury may infer from the treatment decision itself that no exercise of professional judgment actually occurred. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Zaya, 836 F.3d at 804-05.

It undisputed that Dr. Murphy provided the plaintiff ongoing medical care for his testicular pain, nasal symptoms and abdominal pain over the course of several years. The plaintiff has identified several of Dr. Murphy's treatment decisions that he contends demonstrate deliberate indifference.

Regarding his testicular pain, the plaintiff says that Dr. Murphy's delay in sending the plaintiff to the pain clinic, after Dr. Streeper recommended it on August 9, 2013, caused him unnecessary pain and demonstrated deliberate indifference. Dkt. No. 178 at ¶23. The plaintiff argues that Dr. Murphy acted with deliberate indifference when he did not follow Dr. Streeper's February 2014 recommendation for surgery. Dkt. No. 178 at ¶28. The plaintiff also asserts that Dr. Murphy acted with deliberate indifference when he decided to not order surgery after his October 3, 2014 appointment with the plaintiff and that Dr. Murphy resorted to an easier course of treatment that he knew was ineffective. Dkt. No. 178 at ¶34.

Regarding the treatment for his nasal symptoms between October 2013 and February 2014, the plaintiff argues that for more than a year he suffered symptoms and Dr. Murphy experimented with treatments that did not work, that he knew the plaintiff was having a hard time breathing as well as constantly coughing and that a specialist consultation should have been arranged. The plaintiff contends, citing Hayes v. Snyder, 546 F.3d 516 (7th Cir. 2008), that a specialist should have been called in because Dr. Murphy could not identify the cause of his ailment. Dkt. No. 178 at ¶53.

The court can consider several circumstances that may warrant an inference of deliberate indifference. A jury can infer conscious disregard of a risk from a defendant's decision to ignore instructions from a specialist. Zaya, 836 F.3d at 806 (citing Petties v. Carter, 836 F.3d 722, 729 (7th Cir. 2016)). Inexplicable delay in treatment which serves no penological interest can also support an inference for deliberate indifference. Petties, 836 F.3d at 730 (citing Grieveson v. Anderson, 538 F.3d 763, 779 (7th Cir. 2008)). To prove that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff also must provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain. Id. (citing Williams v. Liefer, 491 F.3d 710, 716 (7th Cir. 2007) (delay actionable where medical records showed it unnecessarily prolonged plaintiff's pain and high blood pressure)). A prison doctor's decision to choose an "easier or less efficacious treatment" without exercising professional judgment can constitute deliberate indifference. Id. (citing Estelle, 429 U.S. at 104 n.10; Conley v. Birch, 796 F.3d 742, 747 (7th Cir. 2015) (material fact issue whether provision of only painkillers and ice to an inmate suffering from suspected fracture constituted deliberate indifference)). Persisting in a course of treatment known to be ineffective is another situation that might establish a departure from minimally competent medical judgment. Petties, 836 F.3d at 729-30 (citing Greeno v. Daley, 414 F.3d 645, 655 (7th Cir. 2005) (continuing to treat severe vomiting with antacids over three years created material fact issue of deliberate indifference)).

26

The court must look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference. Petties, 836 F.3d at 728 (citing Cavalieri v. Shephard, 321 F.3d 616, 625-26 (7th Cir. 2003)). Dr. Murphy's delay in following the specialist recommendations regarding the plaintiff's testicular pain make sense both in the context of the care Dr. Murphy was providing for that pain as well as the care he was providing for the plaintiff's other conditions.

After Dr. Streeper's August 9, 2013 recommendation to the pain clinic, Dr. Murphy believed it was appropriate to wait six months to put in a referral to the pain clinic because the plaintiff was highly functional and had reported that the medications and scrotal support gave him some pain relief. Dr. Murphy decided that if there was no improvement in six months, or if the plaintiff's condition changed prior to that, he would reevaluate the recommendation to send the plaintiff to the pain clinic. As it turns out, just over two months later (October 16, 2013), Dr. Murphy saw the plaintiff, the plaintiff's pain had not improved and Dr. Murphy recommended that he be sent to a pain management clinic. The plaintiff was seen by the pain management clinic on November 7, 2013.

While Dr. Streeper recommended surgery to remove the cyst in February 2014, he had noted that surgery might not resolve the plaintiff's pain and that it might worsen the pain. At that time, Dr. Murphy did not believe that surgery was the best option because the plaintiff had recently begun to see the pain management clinic. Dr. Murphy wanted to attempt all conservative methods

27

and avoid surgery, if possible, because there was no evidence that surgery would improve the plaintiff's pain, and there was a very serious possibility that the surgery could worsen his pain. Dr. Murphy felt that it was best to attempt the pain management options first, UW-Urology previously had recommended pain management, the pain clinic had recommended an MRI on the plaintiff's spine which was in the process of being rescheduled due to the plaintiff's cough and nasal congestion, and those conditions also led Dr. Murphy to believe that the plaintiff was not in the best health to undergo an elective operation to remove a cyst.

After the plaintiff's October 3, 2014 appointment, Dr. Murphy recommended that the plaintiff receive an ultrasound to reevaluate the size of the cyst. He did not think surgery was the best treatment route for the plaintiff because the plaintiff was still quite functional, he had reported some relief from conservative pain management, he was argumentative at the UW Health appointment (which may have influenced their decision), he refused to try a medication used for chronic pain that Murphy had recommended, and Murphy feared that surgery could cause the plaintiff more pain.

Regarding the plaintiff's nasal treatment, the plaintiff was prescribed several medications to address his congestion symptoms such as a nasal steroid inhaler, an antihistamine, a Neti Pot to flush his sinuses and Guaifenesin to thin the nasal secretions. Dr. Murphy wanted to continue to attempt to resolve the issue utilizing conservative treatment options before sending him to an ear, nose and throat specialist because specialists prefer to

see that multiple courses of treatment are attempted and failed before seeing the patient for extreme interventions. Dr. Murphy referred the plaintiff to a specialist on February 11, 2015, who diagnosed the plaintiff with a deviated septum and enlarged turbinates, recommended nasal spray for one month and if that did not work, recommended that the plaintiff consider a septoplasty and turbinate reduction to address the problem.

The court cannot characterize Dr. Murphy's reasons for his treatment decisions as consciously disregarding a serious risk of harm to the plaintiff. See Zaya, 836 F.3d at 806 (jury can infer conscious disregard of a risk from a defendant's decision to ignore instructions from a specialist). Dr. Murphy offered the above-described cogent, medical explanations for his decisions, which the court must accept unless the plaintiff points to evidence that would permit a reasonable jury to reject his explanation as a "post hoc rationalization." Id. at 806 (citing Sain, 512 F.3d at 895 (granting summary judgment to the defendant doctor because the plaintiff provided "no evidence to show that [the doctor's medical explanation] was a sham or otherwise impermissible")).

The plaintiff has not offered any such evidence, nor has he offered evidence to suggest that Dr. Murphy's treatment departed from acceptable medical practice. The plaintiff cites to Hayes, 546 F.3d 516 in support of his contention that Dr. Murphy should have referred him to specialist for his nasal symptoms sooner than he did. In Hayes, the Seventh Circuit held that a jury could infer that a prison physician was deliberately indifferent to a prisoner's

testicular growths and cysts that caused excruciating pain. Id. at 526. The doctor in Hayes refused to provide prescription-strength medication or refer the inmate to a specialist. Id. at 524-25. The doctor also testified that a patient's report of extreme pain without a documented cause did not constitute a "medical necessity," and that referral to a specialist didn't make sense when the doctor didn't know what was causing the pain. Id. at 526.

Dr. Murphy's treatment of the plaintiff's medical conditions is a far cry from that of the doctor in Hayes. Dr. Murphy tried multiple approaches and medications known to be effective for the plaintiff's complaints. He referred the plaintiff to off-site specialists and for diagnostic testing. Dr. Murphy evaluated the effectiveness of the courses of treatment and, when a treatment wasn't effective, tried other approaches. Dr. Murphy exercised professional judgment in evaluating and treating the plaintiff's symptoms and consulted with specialists and incorporated their recommendations into his treatment plan. Considering the totality of the plaintiff's medical care, the evidence leads to only one reasonable conclusion—that the plaintiff received extensive, ongoing medical care and that Dr. Murphy exercised his professional judgment in providing care to the plaintiff. See Zaya, 836 F.3d at 805. The plaintiff's disagreement with the treatment he received from Dr. Murphy does not establish that Murphy acted with deliberate indifference to the plaintiff's medical needs. See Cesal v. Moats, 851 F.3d 714, 721 (7th Cir. 2017) (citing Snipes v. DeTella, 95 F.3d 586, 591 (7th Cir. 1996)). A reasonable factfinder

could not conclude that Dr. Murphy violated the plaintiff's constitutional rights.

> d. Defendants Alsum, Barker, Becher, Burnett, Facktor, Foster, Golden, Hamblin, McCreedy, T. Murphy, Rose, Smith and Spranger

The State defendants contend that these defendants are entitled to summary judgment on the plaintiff's failure to intervene claim. Dkt. No. 160 at 23-26. The plaintiff contends that Dr. Murphy was his assigned medical provider and responsible for his medical care, that at some time all the other defendants worked at the DOC or Oshkosh and that all of them had some contact with the plaintiff during which he complained about health issues and/or physical pain. Dkt. No. 185 at 5. The plaintiff states that none of the defendants abated these issues with effective treatment, which caused him pain. Id.

These defendants cannot be liable on a failure to intervene theory because Dr. Murphy provided constitutionally adequate care. Liability for failure to intervene requires that the defendant "(1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." Gill v. City of Milwaukee, 850 F.3d 335, 342 (7th Cir. 2017) (citing Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994)).

Even if a factual issue existed as to whether Dr. Murphy provided the plaintiff constitutional medical care, these defendants cannot, on this record, be liable in their roles as supervisors or for their handling of the plaintiff's grievances. See Burks v. Raemisch, 555 F.3d 592, 595-96 (7th Cir. 2009). The

record shows that the plaintiff's complaints about his medical care were acknowledged, investigated and addressed. The Constitution does not require that these defendants do more. See id.

3. *Defendant Wall's Motion for Summary Judgment*

Defendant Wall seeks summary judgment because he lacks personal involvement in the alleged constitutional deprivation. Dkt. No. 153 at 3. He also asserts that he is entitled to qualified immunity. Id. at 6. Finally, he contends that the plaintiff's claim against him in his official capacity should be dismissed because he is no longer the DOC secretary and therefore is not the proper party. Id. at 7.

The court will grant Wall's motion for summary judgment based on his lack of personal involvement in the plaintiff's medical care allegations. See Burks, 555 F.3d at 593-94.

## III. Conclusion

The court **GRANTS** defendant Wall's motion for summary judgment. Dkt. No. 152.

The court **GRANTS** the State defendants' motion for summary judgment. Dkt. No. 159.

The court **ORDERS** that this case is **DISMISSED** and will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment.

32

<u>See</u> Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. <u>See</u> Federal Rule of Appellate Procedure 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 1st day of June, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**